**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KERRI KELLY** | : |
| | : |
| v. | : CIVIL ACTION NO. 21-3418 |
| | : |
| **PHILADELPHIA HOUSING** | : |
| **DEVELOPMENT CORP.** | : |

**McHUGH, J.**                                                                                                                 **August 11, 2022**

<u>**MEMORANDUM**</u>

      This action encompasses a variety of claims alleging sex discrimination, including a failure to promote the Plaintiff, creation of a hostile work environment, and termination in retaliation for having reported sexual harassment. But evidence to support the claims is lacking and overshadowed by the undisputed fact that Plaintiff made false statements on her resume and lied on her application for employment, effectively hiding a federal guilty plea related to her misuse of funds when she worked at another public entity. Because a reasonable jury could not find in Plaintiff's favor of her claims, Defendant's Motion for Summary Judgment must be granted in full.

    **I.**     <u>**Factual and Procedural Background**</u>

      Plaintiff Kerri Kelly brings claims for sex discrimination, retaliation, and hostile work environment under Title VII, 42 U.S.C. §2000e-2(a), s*ee* Compl. ¶¶ 29-48, ECF 1, and the Pennsylvania Human Relations Act (PHRA), 43 PA. STAT. §§ 951 *et seq., id.* ¶¶ 49-54.

      On April 10, 2017, Defendant Philadelphia Housing Development Corporation ("PHDC") hired Plaintiff as an Administrative Assistant I. Offer Letter, Mot. Summ. J. Ex. D, ECF 11-2.[1] As part of her application for the position, Plaintiff submitted a resume through the employment

---

[1] Throughout the entire course of Plaintiff's employment with PHDC, she was a member of a union, American Federation of State, County, and Municipal Employees (AFSCME), AFL-CIO, Local 1971. *See* Collective Bargaining Agreement, Mot. Summ. J., Ex. H, ECF 11-2.

website Indeed.  *See* Resume, Mot. Summ. J., Ex. E, ECF 11-2; Kelly Dep. 44:16-19, Mot. Summ. J., Ex. F, ECF 11-2.  Her resume indicated that she had previously worked for the Philadelphia Housing Authority ("PHA") as a Construction Contracts Coordinator from January 2008 to November 2012.  *Id*.  Although Plaintiff had previously worked for PHA, the dates listed on her resume were false.  Kelly Dep. 132:12-15.  In addition, on her employment application form, Plaintiff was asked, "Have you ever been dismissed from employment for inefficiency, delinquency, or misconduct, or have you ever been permitted to resign to avoid dismissal?" Application, Mot. Summ. J., Ex. G, ECF 11-2.  Plaintiff falsely responded "no."  *Id.*  PHDC would later learn that Kelly had in fact either been dismissed from PHA for reasons related to misconduct, or at a minimum had been permitted to resign to avoid dismissal.[2]

During her tenure as an Administrative Assistant, Plaintiff was the subject of several complaints and warnings.  Specifically, on June 13, 2018, Plaintiff's supervisor at the time, Nancy Burns, gave her a verbal warning for unprofessional behavior following a client complaint. Warnings, Mot. Summ. J., Ex. I, ECF 11-2.  On October 25, 2018, Ms. Burns issued her a written warning for being "rude, unprofessional, and somewhat threatening during a recent conversation" with a contractor who had also complained about her behavior.  *Id*.  Finally, on January 7, 2019,

---

[2] The exact circumstances of Plaintiff's departure from PHA are ambiguous.  Plaintiff's PHDC termination letter states that "we found out that your employment at PHA began on January 17, 2006, and ended on November 9, 2008, when you were dismissed for failing to disclose a 1997 forgery conviction on that employment application."  Termination Letter, Mot. Summ. J., Ex. W, ECF 11-2.  In 2011, Plaintiff also pleaded guilty to extorting kickbacks from PHA contractors throughout the course of her employment there. In her deposition, Plaintiff testified that "no formal termination was ever given to me from PHA" but admitted that that her employment at PHA ended "based on my convictions within the federal system ... I was convicted, found guilty of crimes that were—that happened at PHA." Kelly Dep.  133: 13-23.

Regardless of whether Plaintiff was terminated because she lied about a forgery conviction on her employment application to PHA, or because she extorted kickbacks in return for the award of work, in her Response in Opposition, Plaintiff does not dispute that her dismissal or resignation from PHA was related to misconduct, which she failed to disclose in her application to PHDC.

Burns suspended Plaintiff for one day without pay as a result of another complaint arising from her "rude and unprofessional" treatment of a client. *Id.*

The same day that she was notified of her suspension, January 7, 2019, Plaintiff emailed David Thomas, PHDC's President and CEO, to request a transfer to a different position within PHDC. Kelly Email to Thomas, Mot. Summ. J., Ex. J, ECF 11-2. Plaintiff took a standardized PHDC Housing Inspector test and based on her score, was transferred to the position of Housing Rehab Inspector II, effective April 15, 2019. Trent Dep. 101:4-6, Mot. Summ. J., Ex. B; Salary Change Order, Mot. Summ. J., Ex. L, ECF 11-2; Internal Memorandum of Transfer, Mot. Summ. J., Ex. M, ECF 11-2.

As a Housing Rehab Inspector II, Plaintiff was responsible for creating work orders for contractors. Torres Dep. 11:10-11, Mot. Summ. J., Ex. N, ECF 11-2. PHDC reports that they were dissatisfied with aspects of her performance. For example, Angela Chandler, the Vice-President of Construction and Finance, regularly reviewed employees' key performance indicators. Chandler Dep. 15:5-19, Mot. Summ. J., Ex. O. Plaintiff's performance indicators showed that "she was performing a little slower than what I would anticipate." *Id.* On average, employees in her position were expected to complete two to three inspections, if not more, per day, but Plaintiff often only completed one to two. *Id.* at 16:3-9.

In November 2019, Plaintiff emailed Chandler to request a promotion to the Housing Rehab Inspector III position. Kelly to Chandler Email, Mot. Summ. J., Ex. Q, ECF 11-2. Chandler advised her colleagues George Russell, Director of the Housing Improvement Program, and Miguel Torres, Director of Construction and Rehab, that she would not consider promoting Plaintiff until after they had sufficient time to review the work orders Plaintiff completed for PHDC clients to ensure that she was not overlooking key items. *See id.* On December 4, 2019,

3

after Plaintiff emailed Chandler again to follow up on her request for a promotion, Chandler advised Plaintiff that she would discuss her request with Torres and Russell during their bi-weekly meeting on December 13, 2019. *See* Email from Chandler to Kelly, Mot. Summ. J., Ex. R, ECF 11-2. Plaintiff was never promoted to the level III position, which Plaintiff alleges is because of her gender. At some point, Plaintiff requested her test results from the standardized Housing Inspector test, but the Defendant never provided them to her.[3]

On December 2, 2019, PHDC hired a male applicant, Eugene Waddington, as a Housing Inspector III. Waddington Offer Letter, Mot. Summ. J., Ex. S, ECF 11-2. In his application for employment, Mr. Waddington left the date portions of his prior employment blank. Application, Ex. to Pl.'s Resp., ECF 12-2 at 93.[4] In addition, Mr. Waddington had previously pleaded guilty to burglary, yet was hired by PHDC despite his criminal record.[5] Waddington Dep. 6:9-16, Ex. to Pl.'s Resp., ECF 12-1 at 23. Plaintiff attaches a memorandum sent from Donna Trent, the Vice President for Human Resources, to David Thomas, describing the findings from Mr. Waddington's background investigation and providing her personal recommendation that his employment be terminated as a result of his prior conviction of burglary, while noting that Mr. Thomas' decision about how to proceed was required. ECF 12-3 at 98. The memorandum notes that Mr. Waddington planned to speak with his lawyer and provide her with evidence that "would help his case." *Id*. Ultimately, Mr. Waddington's employment was not terminated. Plaintiff also attaches

---

[3] Defendant has also failed to produce Plaintiff's test during discovery. PHDC represents that it cannot find her test document because the HR employee at the time "was not doing a good job at all. His recordkeeping was bad." Trent Dep. 96:9-16. That employee has since been terminated. *Id.*

[4] Plaintiff's Response in Opposition refers to the attached exhibits with letters, but the filing contains no such labels, so the pin cites I use throughout for Plaintiff's exhibits are to the PDF pagination on ECF.

[5] Plaintiff incorrectly refers to Mr. Waddington's prior criminal history as having been convicted of robbery throughout her Response in Opposition.

4

Mr. Waddington's Housing Rehab Inspector II and III test. Ex. to Pl.'s Resp., ECF 12-4 at 101. The top of the test indicates that a passing score is 70 for Inspector II and 80 for Inspector III. *Id.* Mr. Waddington's score is listed as a 75, yet he was hired as an Inspector III. *Id.* Plaintiff alleges that Mr. Waddington was not qualified and had insufficient test scores to obtain the position of level III but was nonetheless placed in the position.

On Mr. Waddington's first day working at PHDC, Mr. Torres assigned him to shadow the Plaintiff. Waddington Dep. 38:6-24, Mot. Summ. J., Ex. T, ECF 11-2. She initially refused to allow him to shadow her because she did not believe that she should train an Inspector III, but Torres explained that she was not being asked to train him, only to let him ride along and observe her conducting home inspections. Kelly Dep. 76:7-18; Trent Dep. 133:2-9.

During the ride along, Plaintiff alleges that Mr. Waddington made her feel uncomfortable and sexually harassed her. Specifically, she alleges that she showed him a picture of her in evening wear and Mr. Waddington told her, "Wow, you look good enough to eat." Kelly Dep. 76:19-77:1; Investigation Summary Report, Mot. Summ. J., Ex. V, ECF 11-2. She reported this conduct to Torres, *see* Torres Email, Mot. Summ. J., Ex. U, ECF 11-2, who then passed on the complaint to Human Resources, which opened an investigation into her complaint the same day. Investigation Summary Report, Ex. V. Two other women also lodged complaints against Mr. Waddington.[6] Torres Email, Ex. U. PHDC investigated and ultimately determined that the complaint of sexual harassment was unfounded because there were no other witnesses who could corroborate the

---

[6] Specifically, Mr. Torres' notes reflect that in addition to Plaintiff's complaint, one woman witnessed him stick his tongue out in a sexual manner and another woman stated that he was staring at her in a manner that made her uncomfortable. *See* Notes, Mot. Summ. J., Ex. U. A third woman was initially also included as an accuser, but during the investigation, she stated that she did not witness anything and requested to be removed from the investigation. Investigation Summary Report, Mot. Summ. J., Ex. V, ECF 11-2.

allegations and Mr. Waddington denied making the statement. Investigation Summary Report, Ex. V. HR closed its investigation on December 13, 2019. *Id.*

Shortly thereafter, in January 2020, PHDC learned that Plaintiff had a prior criminal conviction for extortion and had previously been terminated from PHA. This revelation occurred as a result of a bi-weekly meeting between Torres, Chandler, and Russell where Plaintiff's performance was raised. Chandler Dep. 20:5-24. Chandler asked Torres about Plaintiff's background and Torres told her that she had previously worked at PHA and "actually had a pretty extensive construction background." *Id*. Later, Chandler searched Plaintiff's name, "Kerri Kelly," and "PHA" to learn more about her background. *Id*. This search yielded media reports about "Kerri Bizzell," a former PHA employee who had been indicted and pleaded guilty of extorting contractors while employed at PHA and obstructing the grand jury investigation into the extortion charges. Chandler Email to Thomas, Mot. Summ. J., Ex. P, ECF 11-2. Chandler emailed David Thomas and the Director of HR, Donna Trent, with this information, stating that Kerri Bizzell might be the same person as Kerri Kelly and that, "if this is the same [employee] we probably need to address this matter." *Id*.

On January 10, 2020, Thomas, Trent, and Plaintiff's Union representative, Matt Foster, met with Plaintiff to discuss the media reports, ask Plaintiff if she was, in fact, Kerri Bizzell, and give her an opportunity to respond. Trent Dep. 71:19-72:14. Plaintiff ultimately admitted that she and Kerry Bizzell were the same person. Kelly Dep. 101:16-17 (responding "yes" to the question, "the excerpt of *The Inquirer* article, did you agree that was you?"). In the course of the conversation, PHDC learned that Plaintiff's actual dates of employment with PHA were 2006 to 2008, rather than the 2008 to 2012 dates provided on her resume when she initially applied to work for PHDC. Termination Letter, Motion Summ. J., Ex. W, ECF 11-2.

On January 16, 2020, PHDC terminated her employment, on the ground that she had lied on her application for employment and resume regarding her work history. Thomas Dep. 10:20-25; Termination Letter, Ex. W. The Union did not file a grievance related to this termination. Trent Dep. 150:7-10. In this case, Ms. Kelly alleges that her termination was due to sex discrimination and in retaliation for having made a complaint of sexual harassment about Mr. Waddington the month before.

## II.     Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion:

### a.    Failure to Promote Claim:

Title VII forbids an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 U.S.C. §2000e-2(a)(1). To establish a prima facie case of employment discrimination under Title VII based on sex, a plaintiff must allege (1) membership in a protected class; (2) qualification for the position in question; (3) an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015).[7]

---

[7] The elements necessary to establish employment discrimination under Title VII are identical to the necessary elements under the PHRA, so the claims will be analyzed together. *See Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001) (analysis of claims under PHRA is identical to analysis under Title VII).

7

Once the plaintiff has established a *prima facie* case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). At this time, the employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994). If the employer is able to satisfy his burden of production, the presumption of discriminatory action raised by the *prima facie* case is rebutted and the burden shifts back to the plaintiff to establish that the employer's legitimate, non-discriminatory reason was merely pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

Here, Plaintiff alleges that PHDC did not consider her for promotion to Housing Inspector III because of her sex even though she was qualified, and that a male employee was treated more favorably. In response, Defendant argues that Plaintiff has failed to make out a *prima facie* case, as there is no evidence that she was qualified for the level III position or that other employees were treated more favorably. Mot. Summ. J. at 8-9. In the alternative, it argues that it has offered a legitimate, nondiscriminatory reason for its employment decision not to promote Plaintiff and that she cannot show that its proffered reason is pretextual.

Plaintiff has failed to create a genuine issue of material fact as to whether her lack of promotion was the result of sex discrimination. Plaintiff, as the party opposing summary judgment, must point "to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes*, 32 F.3d at n. 1. Plaintiff satisfies the first two elements: she is a member of a protected class and failure to promote could be an adverse employment action. But there is no evidence that she was qualified to be a Housing Inspector III beyond her own speculation. *See Wiest v. Tyco Elecs.*

8

*Corp.,* 812 F.3d 319, 328 (3d Cir. 2016) (stating that "conjecture and speculation will not create a genuine issue of material fact sufficient to withstand the grant of summary judgment"). When Plaintiff took the Housing Inspector test, she was placed as a Housing Inspector II as a result of her score. The record reflects that, at that time, Plaintiff did not challenge this placement and the Union did not grieve it on her behalf. Months later, she requested a promotion. Her request was taken seriously, with email correspondence between PHDC employees stating that they should discuss this request, but also expressing a desire to have sufficient time to review her performance before making a decision. Ms. Chandler wrote, "[w]e need to ensure she is being thorough enough on the front end of her work to ensure we are not paying the price of her overlooking key items on the backend. Unfortunately, we don't find out about the backend until the job gets started by a contractor, so we have some timing issues to contend with." Chandler Email, Mot. Summ. J., Ex. Q. Plaintiff identifies no evidence in the record to suggest that any delay was discriminatory.

Plaintiff points to Eugene Waddington as an example of a similarly situated comparator who was treated more favorably, giving rise to an inference of discrimination. Plaintiff advances several arguments related to Mr. Waddington's score on the standardized test. First, she relies on the fact that he was hired as a level III when he scored 75 on the qualifying test when the stated threshold for the position was 80, to argue that test lacks meaning as a qualification. Second, she argues that, even if the test does matter, the fact that a man was hired when he only scored 75 shows that the actual bar for qualification was lower than the stated level of 80. Under either theory, she asserts that she was qualified for a level III position, and the fact that a man was given the job instead gives rise to an inference of discrimination.

As an initial matter, it is not clear that Mr. Waddington is "similarly situated" to Plaintiff. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 645-646 (3d Cir.1998). A

9

similarly situated employee does not need to be identically situated, but the comparator must be similar to plaintiff in all relevant respects. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–261 (5th Cir. 2009). Here, Plaintiff was an internal candidate already at Level II who had received critical feedback from customers and her supervisor during her tenure as an Administrative Assistant, and whose performance as a Level II inspector was slower than expected. Mr. Waddington, in contrast, was an external candidate who had no prior work history with PHDC, and Plaintiff does not point to any other male Level II employee who was similarly struggling but promoted, nevertheless.

Even assuming that Mr. Waddington were a similarly situated applicant, there is a more fundamental issue with Plaintiff's argument: She does not allege that she scored above a 70 on the Housing Inspector test. The only evidence in the record of Plaintiff's score is from Mr. Thomas, who testified with assurance that her score was below a 70. Thomas Dep. 101: 8-11, Def.'s Reply, Ex. 1, ECF 13-1. Plaintiff does not dispute this and did not initially grieve or dispute her placement at a Level II position.

Moreover, even if Plaintiff could establish a *prima facie* case of discrimination in the failure to promote her, a reasonable jury could not find that Defendant's proffered reason for not promoting her was pretextual. Once a plaintiff establishes a *prima facie* case, Defendant must answer with legitimate, nondiscriminatory reasons for its action. *See Fuentes*, 32 F.3d at 764. If Defendant meets this "relatively light burden," the burden of production shifts back to the plaintiff who must show that each of the employer's reasons are pretextual. *Id.* at 763. To demonstrate pretext and defeat summary judgment, the plaintiff must then identify evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

In this case, PHDC's proffered reason is that she was not qualified for promotion. Even when the facts of this case are viewed in the light most favorable to the Plaintiff, there is ample evidence in the record from which a factfinder could believe Defendant's articulated reason. In response, Plaintiff points to the hiring of Mr. Waddington when he scored below the required metric as evidence that PHDC did not really follow its stated standard. She also faults Defendant's inability to produce her Housing Inspector test results. Plaintiff argues that such failure "reeks of foul, discriminatory circumstances" and is sufficient for a factfinder to disbelieve the employer's reason. Pl.'s Resp. at 13. As an explanation for the missing test document, PHDC maintains that the record was lost due to incompetent record keeping by an employee since replaced. Trent Dep. 96:10-16. In a different context, the missing document might cast doubt on PHDC's assertions that Plaintiff was not qualified for the Level III position. Here, however, Plaintiff herself does not allege that she scored the same or higher than Mr. Waddington. In addition, the record reflects that she did not dispute her initial placement as a Level II, which presumably she would have done had she scored high enough to qualify as a Level III. In short, there is no evidence in the record to contradict Mr. Thomas' assertion that she scored below a 70. Given this, Plaintiff has failed to point to record evidence from which a reasonable jury could find PHDC's explanation "unworthy of credence." *Fuentes*, 32 F.3d at 765.

### b. Unlawful termination claim:

Plaintiff also brings a sex discrimination claim based on her termination, which is analyzed under the same framework described above. Here, the record reflects that Plaintiff was a member of a protected class, qualified for her position, and subject to an adverse action. The only element

11

at issue is whether the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination.

Plaintiff fails to make out a *prima facie* case because no reasonable juror could find that her termination occurred under circumstances giving rise to an inference of unlawful discrimination. Plaintiff relies on her belief that Mr. Waddington was similarly situated yet treated more favorably than her. Specifically, she refers to the fact that he left dates blank on his application and that he too has a criminal record but was both hired and retained. Plaintiff argues that the hiring of Mr. Waddington indicates that PHDC "does not consider that the background of employees to be of importance to hiring them. It did not do a Google search in 2017; it does not care that Mr. Waddington has a violent criminal [sic] and sends him into homes." Pl.'s Resp. at 16. This argument is not supported by any citation to the record. In fact, the record reflects that PHDC does conduct background checks on its employees. Trent Dep. 30:12-31:2.[8] Moreover, although Mr. Waddington ultimately retained his job, his prior conviction was taken seriously, as evidenced by the memorandum from Ms. Trent to Mr. Thomas specifically questioning whether he was fit for the position by virtue of his criminal record. *See* Memorandum, Pl.'s Resp., ECF 12-3 at 98.

In addition, there are substantial differences between Mr. Waddington's situation and Plaintiff's. *See Anderson v. Haverford Coll.*, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (noting that to be considered similarly situated, the comparator must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (internal citation omitted). Plaintiff listed false dates on her resume, affirmatively seeking to mislead the reader; Mr. Waddington left dates blank, which

---

[8] Presumably, Plaintiff's criminal record was not discovered as part of the background check because she used a different name and did not disclose it on her application.

would have been obvious to anyone reviewing the application. Plaintiff also acted deceptively when she responded "no," to the question "[h]ave you ever been dismissed from employment for inefficiency, delinquency, or misconduct, or have you ever been permitted to resign to avoid dismissal?" on her application. Plaintiff now admits that her employment with PHA ended "based on my convictions within the federal system." Kelly Dep. 133:13-23. As to the application process, these differences are significant.

More importantly, Plaintiff's criminal record raised far more concerns. As PHDC aptly characterizes the difference: "Mr. Waddington pled guilty to committing burglary on one occasion. Plaintiff was convicted of obstructing justice and abusing her position as a PHA manager by operating a kickback scheme involving the extortion of contractors. Plaintiff's elaborate operation went on for six months, involved the misappropriation of federal funds, and ultimately brought negative national media attention and shame on her employer." Def.'s Reply at 6. PHDC's professed concern is logical, because in Ms. Kelly's role at PHDC, "she again had access to contractors and federal funds." *Id.*

Even if Plaintiff could make out a *prima facie* case, Defendants proffer a legitimate, non-discriminatory reason for her termination: the discovery of her misrepresentations regarding her past and the nature of her criminal record. Absent any evidence to support it, Plaintiff's speculation that her termination was discriminatory does not suffice to establish pretext. *See Jones,* 198 F.3d at 414. Plaintiff has failed to show that PHDC's "proffered reasons are weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find them unworthy of credence" or that "the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it could not have been the employer's real reason." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003) (cleaned up).

### c. **Hostile Work Environment Claim:**

Plaintiff also asserts that she was subjected to a hostile work environment. To prevail on a hostile work environment theory of sex discrimination, a plaintiff must prove (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) she was detrimentally affected by the discrimination; (4) the detrimental effect was objectively reasonable; and (5) the existence of *respondeat superior* liability. *Mandel v. M & Q Packing Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017).

The conduct giving rise to a hostile work environment "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Title VII is violated "when the workplace is permeated with discrimination, intimidation, ridicule and insult that is sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs.,* Inc., 523 U.S. 75, 78 (1998) (citation omitted); *see also Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214-15 (3d Cir. 2017).

Here, Plaintiff complains that Mr. Waddington's purported sexual harassment on their ride-along created a hostile work environment. As noted above, as she was showing him of picture of her dressed in eveningwear, he told her that she looked "good enough to eat."[9] In her brief, Plaintiff also argues that "Ms. Kelly also testified that more than two comments or acts occurred here." Pl.'s Resp. at 15. Puzzlingly, Plaintiff does not provide any citation for this assertion,

---

[9] This expression is an outdated idiom. *See good-enough-to-eat,* Your Dictionary.com*:* "Supremely beautiful; aesthetically pleasing." (idiomatic), https://www.yourdictionary.com/good-enough-to-eat (last visited Aug. 10, 2022). It could easily be meant as a sexual innuendo, and in any event would be an inappropriate remark to a co-worker.

identify other additional acts, or even attach Plaintiff's deposition to the motion. Thus, this one comment constitutes the totality of the record before me. Absent some extraordinary circumstance, such a single comment is insufficient to "permeate" the workplace "alter the conditions" of employment. *See Faragher,* 524 U.S. at 788 (noting that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). Moreover, the record reflects that PHDC promptly opened an investigation into the complaint and was unable to corroborate the allegations. Plaintiff does not allege that any further harassment occurred in the time period between her complaint and her termination. *See Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997) (holding that determining whether remedial action taken by employer in response to complaint of hostile environment sexual harassment was adequate requires consideration of whether the action was reasonably calculated to prevent further harassment); *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F.Supp.2d 639, 654 (E.D. Pa. 2012) (granting summary judgment because the employer took prompt and appropriate remedial action). No reasonable juror could find that Mr. Waddington's comment sufficed to create an atmosphere so severe and pervasive as to create an abusive working environment, especially where PHDC responded to her complaint swiftly and no further harassment is alleged. Defendant's Motion for Summary Judgment will therefore be granted as to the hostile work environment claim.

      **d. <u>Retaliation Claim:</u>**

Finally, Plaintiff alleges that her termination was in retaliation for having made a complaint of sexual harassment. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment...because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted,

or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

To establish a *prima facie* claim of retaliation, a Plaintiff must show that (1) she engaged in protected activity, (2) PHDC took adverse employment action against her, and (3) there was a causal connection between her protected activity and the adverse employment action. *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010). "If the employee establishes this prima facie case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore v. City of Philadelphia,* 461 F.3d 331, 342 (3d Cir. 2006) (cleaned up).

Verbal complaints to management are sufficient to constitute protected activity. *Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) (stating that complaints to employer, "whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case"). And opposition to unlawful discrimination need not be significant or formal. Rather, the Third Circuit has directed courts to focus on the "message being conveyed rather than the means of conveyance." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.,* 450 F.3d 130, 135 (3d Cir. 2006); *see also Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 277 (2009) (observing that the term "opposition" may be used in reference to "someone who has taken no action at all to advance a position beyond disclosing it"). "A plaintiff need not prove the merits of the underlying discrimination complaint, but only

that '[s]he was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture*, 85 F.3d 1074, 1085 (3d Cir. 1989) (cleaned up).

Plaintiff's complaint to management about Mr. Waddington constitutes protected activity and her employment was terminated, which is clearly adverse. The sole issue is whether there is a causal connection between the protected activity and the adverse action. A plaintiff may rely on a range of evidence to demonstrate the causal link between the protected activity and the adverse action, including by showing temporal proximity that is "unusually suggestive of a retaliatory motive," *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000), or "a pattern of antagonism" coupled with timing to establish a causal link, *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997).

Plaintiff's employment was terminated more than a month after she lodged her complaint. This timing is not in itself unusually suggestive. *See Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001) (holding that to establish causation based on timing alone, temporal proximity between protected activity and an adverse employment action must be "very close"); *Krouse*, 126 F.3d at 503 (the simple fact that an adverse employment action occurs after a complaint is filed is ordinarily insufficient to satisfy the plaintiff's burden of establishing a causal link between the complaint and the adverse action); *Thomas v. Town of Hammonton,* 351 F.3d 108, 114 (3d Cir. 2003) (period of three weeks between sexual harassment complaint and dismissal did not constitute "unusually suggestive temporal proximity"). Plaintiff attempts to minimize this time period by stating that it contained the winter holiday season, as well as the "dawn of COVID," such that it could "easily be cut down to the three weeks that many courts have found to be close enough." Pl.'s Resp. at 15. This argument is unpersuasive: as of January 2020, COVID had not yet created a significant disruption in the workplace domestically.

17

Taking the record as a whole, the chronology does not provide substantial support for Plaintiff's position. Plaintiff has not identified any pattern of antagonism or "other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). The record is devoid of any "constant barrage of written and verbal warnings" or disciplinary action that took place soon after the protected activity. *Robinson v. SEPTA*, 982 F.2d 892, 896 (3d Cir. 1993).

Even if Plaintiff was able to make out a *prima facie* case, as discussed above, PHDC has clearly advanced a legitimate, non-retaliatory reason for her termination: lying on her application. Plaintiff then must prove that the proffered reason is pretextual and that the real reason was retaliation. Plaintiff points to no such evidence. Plaintiff speculates that PHDC was only prompted to look more deeply into her background as retaliation for filing her complaint. "Looking at the surrounding circumstances: we find that Defendant searched for a reason to fire Ms. Kelly… if Defendant had wanted to do a Google search on Ms. Kelly regarding her qualifications or her application to work for Defendant, Defendant could have done so as a condition of employment in April 2017." Pl.'s Resp. at 16. Plaintiff points to no evidence in the record to support this theory. Rather, the record reflects that Ms. Kelly was the subject of Ms. Chandler's attention due to Ms. Kelly's performance indicators lagging. Chandler Dep. 20:13-15 ("We were looking at KPIs when her numbers were lagging and I started asking about her background…"). And speculation alone is insufficient to sustain a retaliation claim because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)). Finally, even if I were to impute a retaliatory motive to PHDC in commencing further inquiry into Plaintiff's background, what it discovered

was objectively troubling and would have a provided a lawful basis for termination.  Defendant's Motion for Summary Judgment will therefore be granted as to her retaliation claims.

### IV.     Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted in its entirety.  An appropriate order follows.

/s/ Gerald Austin McHugh  
United States District Judge